## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| **FRED SAMP AND LINDA SAMP, individually** ) <br> **and on behalf of other similarly situated persons,** ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> **v.** ) <br> ) <br> **DAVID J. HERNANDEZ, also doing business as** ) <br> **"NEXTSTEP FINANCIAL SERVICES, INC.",** ) <br> **NEXTSTEP MEDICAL STAFFING IL, INC.,** ) <br> **NEXTSTEP HOLDINGS, INC., SPECTRUM** ) <br> **ENTERTAINMENT GROUP, INC., THE** ) <br> **ILUMINA GROUP, INC.,GINA M.** ) <br> **HERNANDEZ, MICHAEL NORTH, DANIEL** ) <br> **JIGGETTS, BEBE NORTH, CORTEZ** ) <br> **TROTTER, and ANNE WILLIAMSON,** ) <br> ) <br> **Defendants.** ) | **Civil Action No.: 09 CV 4485** |

## COMPLAINT AT LAW

Plaintiffs, Fred Samp and Linda Samp, individually and on behalf of others similarly situated ("Plaintiffs"), allege as follows:

## NATURE OF THE ACTION

1.     Plaintiffs bring this instant class action to recover their monies from a fraudulent investment scheme run by David J. Hernandez ("Hernandez"), a convicted felon. From at least February 2008 to the present, Hernandez, who also did business under the name NextStep Financial Services, Inc. ("NextStep Financial"), offered and sold securities in the form of "Guaranteed Investment Contracts" ("GICs") to investors in unregistered and fraudulent transactions that violate federal securities law.  Hernandez told investors that GICs were an investment in his successful financial services company, NextStep Financial, and that investors

would earn a high, guaranteed rate of return of 10% to 16% per month with no risk.  Hernandez's sale of GICs raised more than $11 million dollars from investors in at least 12 states.

2.      In connection with his offer and sale of GICs, Hernandez made numerous materially false and misleading statements to the Plaintiffs and the class about himself, about NextStep Financial, and about the investment he wanted the investors to buy. These misstatements were also repeated on the website for NextStep Financial at www.nsfillinois.com. (See Exhibit "A"). Specifically, Hernandez told Plaintiffs and all other investors and the Class:

> a.  That he had an extensive background in banking and business, including having business and law degrees from specific universities, when in fact, he did not have these degrees and his "banking experience" included a prior federal conviction for wire fraud arising out of Hernandez's employment at a bank.

> b.  That NextStep Financial was a successful Chicago financial services firm for which he was "President and CEO," when in fact, NextStep Financial was a defunct corporation since 2001 that conducted no financial services operations at all, other than running the fraudulent scheme alleged herein.

> c.  That NextStep Financial had a highly profitable business funding loans made by Check 'N Go stores and that NextStep Financial owned a number of Check 'N Go stores.  In fact, Hernandez and NextStep Financial have no business relationship with Check 'N Go at all.

d. That their investments in GICs were completely safe because they were covered by two levels of insurance, one provided by Check 'N Go for the loans it made to its customers, and another purchased by NextStep from certain specified insurance companies. This was also false, as Check 'N Go has nothing to do with Hernandez or NextStep Financial and therefore, does not insure the GICs. In addition, the Security and Exchange Commission's ("SEC:") review of the known Hernandez related bank accounts shows no payments to purchase insurance from the companies Hernandez identified as providing insurance to NextStep Financial's investors.

3. After obtaining funds from Plaintiffs and the Class, Hernandez deposited investors' funds into bank accounts of other companies that he created and controlled, including defendants NextStep Medical Staffing IL, Inc. ("NextStep Medical") and NextStep Holdings, Inc. ("NextStep Holdings").

4. From those accounts, Hernandez operated a classic Ponzi scheme, using Plaintiffs' and the Class' investor funds to pay Plaintiffs and the Class investors their promised returns, and diverting and misappropriating the rest for himself, his family, and other business ventures that were unrelated to the stated purpose of the GIC investment program. Hernandez diverted investor funds to himself, to his wife, defendant Gina M. Hernandez ("Gina Hernandez"), to pay off the mortgage on their home, to purchase cars, jewelry, a piano, and for other non-investment related purposes. Hernandez also transferred investor funds to the bank accounts of two other companies he created and controlled, defendants Spectrum Entertainment Group, Inc. ("Spectrum") and The Ilumina Group, Inc. ("Ilumina"). The Spectrum and Ilumina

accounts funded, among other things, a Chicago sports-talk website associated with Hernandez called "Chicago Sports Webio" ("CSW")

5.　　By virtue of his conduct as alleged herein, Hernandez has engaged in transactions, acts, practices, and courses of business that constitute violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e(a), e(c), and q(a)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule I Ob-5 [17 C.F.R. § 240.1 Ob-5] promulgated thereunder.

## JURISDICTION AND VENUE

6.　　The investments offered and sold by Defendants are "securities" under Section 2(1) of the Securities Act [15 U.S.C. § 77b], Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c], Section 2(36) of the Investment Company Act [15 U.S.C. §80a-2(36)], and Section 202(18) of the Advisers Act [15 U.S.C. § 80b-2(18)].

7.　　This court has jurisdiction over this action, and venue is proper under Section 22(a) of the Securities Act [15 U.S.C.§ 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 43 of the Investment Company Act [15 U.S.C. § 80a-43], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] This Court also has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. §§ 1331 and 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the putative plaintiff class are citizens of States different from Defendants.

8.     Plaintiff further invokes the supplemental jurisdiction of this court pursuant to 28 U.S.C. § 1367 to hear and decide claims arising out of Illinois state law. Venue is proper pursuant to 15 U.S.C. § 80b-14 and 28 U.S.C. § 1391.  Defendants regularly transact and solicit business in this District.

## DEFENDANTS

9.     **David J. Hernandez**, age 48, lives in Downers Grove, Illinois. Hernandez told investors that he was President and CEO of NextStep Financial, an Illinois corporation he incorporated in 2001, but which was involuntarily dissolved in May 2003.  In 1998, Hernandez was convicted in federal district court of wire fraud arising from his previous employment at a bank in the case of *USA v. David J. Hernandez,* Case No. 97cr591.  In 2004, 2005 and 2006, Hernandez and his wife, Gina Hernandez, filed bankruptcy petitions under Chapter 13 of the Bankruptcy Code.

10.     **NextStep Medical Staffing IL, Inc.** is an Illinois corporation with its principal place of business at 225 W. Washington Street, Suite 1600, Chicago, Illinois.  Hernandez incorporated NextStep Medical in February 2008.  According to its website, NextStep Medical is a medical staffing business.  During the relevant period, Hernandez controlled NextStep Medical's bank account, into which he deposited more than $10.5 million of investor funds according to the lawsuit brought by the SEC.

11.     **NextStep Holdings, Inc.** is an Illinois corporation incorporated by Hernandez in October 2008.  NextStep Holdings has no known place of business.  Hernandez controlled its only known bank account, into which he deposited more than $900,000 in investor funds according to the lawsuit brought by the SEC.

12.      **Spectrum Entertainment Group, Inc.** is an Illinois corporation incorporated by Hernandez in December 2008. Spectrum appears to have funded a Chicago sports-talk website related to Hernandez. However, Hernandez controls its only known bank account into which he diverted more than $160,000 of investor finds according to the lawsuit brought by the SEC.

13.      **The Ilumina Group, Inc.** is an Illinois corporation incorporated by Hernandez in October 2008.  Ilumina also appears to have funded a Chicago sports-talk website related to Hernandez. Hernandez controls its only known bank account into which he diverted more than $380,000 of investor funds according to the lawsuit brought by the SEC.

14.      **Gina M. Hernandez** is Hernandez's wife and a resident of Downers Grove, Illinois.  Gina Hernandez ("Gina Hernandez") is or was an elementary school teacher. Hernandez diverted at least $90,000 of investor funds to Gina Hernandez according to the lawsuit brought by the SEC. In addition, Hernandez used more than $300,000 of investor funds to pay off a mortgage on the house that Hernandez and Gina Hernandez live in and jointly owned at the time of the payment.

15.      **Michael North and BeBe North** were Hernandez's business partners in Chicago Sports Webio, a business funded by Hernandez by ill-gotten funds from Nextstep investors. Both were officers of CSW and knew or should have known that monies invested into CSW were from illegal and improper sources such as investors in NextStep.  They then received monies as compensation from CSW and which monies were the ill gotten gains taken from Plaintiffs and other class members.

16.      **Daniel Jiggetts** is Hernandez's business partner in Chicago Sports Webio, a business funded by Hernandez by ill-gotten funds from Nextstep investors.

17.     **Cortez Trotter** was a business consultant for Hernandez and oversaw the operations of the Nextstep entities.

18.     **Anne Williamson** was an associate of Hernandez who, upon information and belief, referred people to Hernandez and the NextStep entities in exchange for payment.

### THE FRAUDULENT SCHEME

19.     Beginning by at least February 2008, Hernandez began offering and selling GICs to investors.

20.     Hernandez incorporated NextStep Financial as an Illinois corporation in 2001, but it was involuntarily dissolved in May of 2003. It was never reinstated.

21.     Despite its earlier dissolution, Hernandez told prospective investors that NextStep Financial was a successful, Chicago financial services company, and created an elaborate website for NextStep Financial to give the appearance that it was a real business.  Hernandez also told investors that he had an extensive background in banking and business and that he was NextStep Financial's President and CEO.

22.     When describing NextStep Financial's business, Hernandez told Plaintiffs and investors that NextStep Financial owned a number of Check 'N Go stores and provided funding for a number of others.

23.     Check 'N Go stores provide various services to its customers, including check cashing, short-term consumer lending, deferred deposits and payroll advancements. Check 'N Go stores are sometimes referred to as payday lenders.

24.     Hernandez told Plaintiffs and the Class investors that NextStep's payday lending was highly profitable and that investors could invest in NextStep Financial through its GICs,

which would pay them a high, guaranteed rate of return, generally 10% to 16% per month, with no risk.

25.    Hernandez told investors that the GICs were safe because they were covered by two types of insurance, one provided by Check 'N Go for the loans it made to its customers and another by Next Step, which insured the GICs through certain specified "national" insurance companies such as Axiom, Nationwide Insurance Group, National Fidelity, and Equitable Insurance. (See Exhibit "A").

26.    Hernandez also used NextStep Financial's website (www.nfsillinois.com) to sell GICs and on at least one occasion, offered the GICs to a group at a meeting in Michigan.

27.    The website touted Hernandez's banking and business experience and represented that he had received a B.S. in Finance and an M.B.A. from the University of Wisconsin and a law degree from the "John Marshall Law School at DePaul University - Chicago." (See Exhibit "A").

28.    The website also provided information about the GICs, included a sample GIC and discussed NextStep Financial's payday lending relationship with Check 'N Go.  The website included sections entitled "FAQ" and "definitions" and discussed the alleged insurance coverage over any investments.  The website also contained several charts that purported to show the rapid growth of an investment in NextStep Financial that was "rolled over" (i.e. not withdrawn) over time.  For example, one chart purported to show that a $10,000 investment would be worth $31,958 after one year.  (See Exhibit "A").

29.    After deciding to invest, investors typically sent Hernandez a check or cashier's check payable to NextStep Financial and signed a GIC entitled: "NextStep Financial Services,

Inc. Guaranteed Investment Contract (G.I.C.)." Plaintiffs signed a GIC on January 17, 2008 and gave Hernandez checks in the amount of $156,000.

30.     The GIC purported to be a contract between the investor and NextStep Financial. The GIC stated that investors were investing in NextStep Financial and that "said funds are fully secured in a High Yield Investment Program, (hereinafter called "The Program") and insured by one of several National Insurance Groups, which include Fidelity, Nationwide and Equitable Insurance." (See Exhibit "B").

31.     The GIC stated a fixed rate of return of 10% to 16% per month and provided that NextStep Financial guaranteed the distribution of the investor's principal and interest payments. The GICs stated that they had a term of three months and automatically renewed unless the investor directed otherwise. (See Exhibit "B").

### False and Misleading Statements to Plaintiffs and the Class

32.     When offering and selling the GIC investments to Plaintiffs and the Class, Hernandez made a number of false statements of material fact, and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which there were made, not misleading.

33.     Hernandez made the following false and misleading statements to Plaintiffs and the Class:

> a.      When telling Plaintiffs and the Class about his extensive banking and business experience, Hernandez failed to disclose that in 1998 he was convicted for wire fraud arising from his employment at **a** bank. In 1997, Hernandez was indicted in *U.S.A. v. David J. Hernandez,* Case No. 97cr591, in the United States District Court for the Northern District of Illinois. The four-count indictment filed against Hernandez alleged, among other things, that while employed as a vice-president at Columbia National Bank in Chicago, he diverted money that investors sent to the bank for investment purposes to accounts under his personal control. Hernandez pled guilty to one count of wire fraud and was sentenced in

- 9 -

October 1998 to 34 months in prison followed by 5 years of supervised release. In addition, the court ordered Hernandez to make restitution of $590,533.67.

b.     When telling Plaintiffs and the Class about his banking and business experience, Hernandez failed to disclose that he filed for bankruptcy under Chapter 13 of the Bankruptcy Code in 2004, 2005 and 2006.

c.     Hernandez misrepresented his educational background to Plaintiffs and the Class, telling them he had a B.S. in Finance, an M.B.A and a J.D., when he did not.  Each of the universities from which he claimed a degree has denied that he attended their school.  In fact, The John Marshall Law School at DePaul University does not even exist- they are separate law schools.

d.     Hernandez told Plaintiffs and the Class that NextStep Financial was a successful financial services company with a profitable payday lending relationship with Check 'N Go, when in fact, NextStep Financial was a defunct company with no operations at all, other than the fraudulent scheme alleged in this complaint.  In addition, neither NextStep nor Hernandez has any business relationship with Check 'N Go or any of its related companies.

e.     Hernandez told Plaintiffs and the Class he would invest their funds in NextStep Financial and use those funds for its payday lending operations with Check 'N Go.  This statement was false as Hernandez used no investor funds for this purpose.  Instead, Hernandez placed investor funds into bank accounts of other companies that he controlled, including Nextstep Medical and NextStep Holdings.  From there, Hernandez paid existing investors their promised returns, transferred investor funds to himself, to Gina Hernandez, to pay off the mortgage on their family home, to purchase cars, jewelry, a piano, and for other non-investment related purposes.

f.     In addition, Hernandez diverted investor funds to two other companies he controlled — defendants Spectrum and Ilumina.  From those accounts, Hernandez also spent investor funds to start up a Chicago sports-talk website called "Chicago Sports Webio" featuring defendants Michael North and Daniel Jiggetts. (www.chicagosportswebio.com). On a broadcast of North and Jiggetts' sports show, North and Jiggetts claimed they knew Hernandez for 16 years, and endorsed defendant Medical Staffing. Upon information and belief, North and Jiggetts made public appearances and endorsed Hernandez and the Nextstep entities.

g.     Defendant Cortez Trotter was hired as a consultant by the Nextstep entities to oversee the operations. Trotter was compensated for his work with ill-gotten funds and knew or should have known of the fraudulent scheme based on his involvement as a consultant.

h.     In addition, the bank records obtained by the SEC show that Hernandez made no payments to the insurance companies purportedly insuring the investors GICs.  Based upon these facts, it is clear that Hernandez also misrepresented the safety of the GIC investments.

**Uses of Investor Funds**

34.     During the period from February 18, 2008 to the present, Hernandez raised more than $11.5 million from more than 100 investors in at least 12 states.

35.     Hernandez deposited these investor funds into bank accounts of other companies that he controlled, including relief defendants NextStep Medical and NextStep Holdings. Hernandez deposited more than $10.5 million of investor funds in NextStep Medical's bank accounts, and more than $900,000 in NextStep Holdings' bank account.  Hernandez may have deposited additional investor funds into other accounts not yet known to Plaintiffs.

36     Hernandez used the majority of these investor funds to pay investors their promised investment returns. He diverted, misappropriated, and dissipated the remaining investor funds.

37.     Hernandez pumped substantial amounts of investor funds into new business ventures of his that were completely unrelated to the payday loan business. For example, he spent more than $630,000 on NextStep Medical's payroll expenses, and spent more than $350,000 on the rental for the NextStep Medical's offices. Notwithstanding these expenditures, the NextStep Medical account does not show *any* receipts of revenues whatsoever since its creation in early 2008.

38.     Hernandez also diverted investor funds to finance Chicagosportswebio.com, a new online sports-talk website owned by Spectrum. Hernandez diverted at least $165,500 of investor funds directly to the Spectrum account, and made other payments for the benefit of

- 11 -

Spectrum's online sports talk station business, including compensation in excess of $100,000 to defendants Michael North and Daniel Jiggetts, Chicago sports radio personalities, for their participation in Hernandez's online sports talk station and public endorsement of the Nextstep entities.

39.     Hernandez expended at least $275,000 of investor funds to pay for advertising and promotion for Chicagosportswebio.com and Medical Staffing.

40.     Hernandez also diverted at least $381,000 of NextStep investor funds relief defendant Ilumina.

41.     Hernandez also diverted investor funds for the benefit of himself and his spouse, defendant Gina Hernandez.  Hernandez wrote checks to Gina Hernandez totaling at least $91,000.  Hernandez also diverted more than $318,000 to pay off the mortgage on their residence in Downer's Grove.  Hernandez also diverted and spent investor funds for various luxury and vanity items and events, including: $25,879 for the purchase of an Audi Quattro automobile, $16,684 for the purchase of a Steinway piano, $34,000 in jewelry purchases from Tiffany's, more than $23,000 for a holiday party at the Ritz-Carlton in December 2008, more than $10,000 for dinners at Nine Chicago.

42.     In March 2009, Hernandez stopped paying Plaintiffs and most of the investors and stopped responding to most investor calls.  Hernandez and NextStep staff repeatedly promised Plaintiffs and other investors that their dividend checks were being mailed, were ready for pickup or would be available in the next day or so.  None of that was true.

43.     As of now, Plaintiffs have lost $156,000 of their monies to Hernandez as a result of his fraudulent scheme.

## CLASS ACTION ALLEGATIONS

44.     Plaintiffs bring all claims herein as class claims pursuant to Fed. R. Civ. P. 23. The requirements of Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) are met with respect to the class(es) defined below.

**A.      Class Definition(s)**

45.     The (b)(2) Injunctive Relief Class consists of:

All persons who invested with Hernandez and NextStep from February, 2008 until June, 2009[1]

46.     The (b)(3) Class consist of:

All persons who invested with Hernandez and NextStep from February, 2008 until June, 2009[2]

Excluded from the Class(es) are:  Defendants, any entities in which they have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees and members of such persons immediate families, and the presiding judge(s) in this case and his, her or their immediate family.

**B.      Numerosity**

47.     At this time, Plaintiffs do not know the exact size of the Class; however, due to the nature of the trade and commerce involved, Plaintiffs believe that the Class members are so numerous that joinder of all members is impracticable.  The number and identities of Class members is administratively feasible and can be determined through appropriate discovery.

---

[1]     Plaintiff reserves the right to amend the class definition based upon future investigation, discovery and the proofs at trial.

[2]     Plaintiff reserves the right to amend the class definition based upon future investigation, discovery and the proofs at trial.

**C.**     **Commonality**

48.     There are questions of law or fact common to the class, including at least the following:

(a)     Whether the investments procured by Hernandez and NextStep are securities within the meaning of Section 2(1) of the Securities Act [15 U.S.C. § 77b], Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c], Section 2(36) of the Investment Company Act [15 U.S.C. §80a-2(36)], and Section 202(18) of the Advisers Act [15 U.S.C. § 80b-2(18)];

(b)     Whether all Hernandez and NextStep used the investments of Plaintiffs and the Class to pay promised returns to Plaintiffs and the Class and/or whether this constituted what is generically referred to as a Ponzi scheme;

(c)     Whether Defendants have acted or refused to act on grounds generally applicable to the Class;

(d)     Whether the conduct of all Defendants violated 15 U.S.C. § 77q(a)(1), 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5, and 15 U.S.C. § 77l

(e)     Whether the conduct of all Defendants constituted breach of contract, fraud,  and a violation of the Illinois Consumer Fraud Act;

(f)     Whether Plaintiffs and other members of the Class have been damaged, and if so, what is the proper measure of such damages.

**D.**     **Typicality**

49.     Plaintiffs have the same interests in this matter as all other members of the Class, and their claims are typical of all members of the class.

E.      **Adequacy**

50.     Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in the prosecution of securities and consumer fraud violations. Counsel for Plaintiffs have defended a SEC violation case known as *SEC v. Enterprise Trust*, et al. 2008 CV 1260 in the United States District Court, Northern District of Illinois. Counsel for Plaintiffs have also represented Plaintiffs in the following class actions: *Scott Bernard v. Jewel Food Stores*, Inc., 2007 CH 7330, Circuit Court of the Nineteenth Judicial Circuit of Illinois; and Irwin *Cohen v. Compact Power Systems, LLC et al.*, 2005 CH 11824, Circuit Court of Cook County, Illinois. Counsel for Plaintiffs have also defended a class action for a case known as *Carmen Flores v. Diamond Bank, FSB*, 2007 C 6403 in the United States District Court, Northern District of Illinois. Plaintiffs will fairly and adequately represent the interests of the Class members and do not have interests adverse to the Class.

F.      **The Prerequisites of Rule 23(b)(2) are Satisfied**

51.     The prerequisites to maintaining a class action for injunctive and equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) exist as Defendants have acted or refused to act on grounds generally applicable to the Class thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole.

52.     The prosecution of separate actions by members of the class would create a risk of establishing incompatible standards of conduct for Defendants.  For example, one court might decide that the challenged actions are illegal and enjoin them, while another court might decide that those same actions are not illegal.  Individual actions may, as a practical matter, be dispositive of the interest of Class members, who would not be parties to those actions.

- 15 -

53. Defendants' actions are generally applicable to the Class as a whole, and Plaintiffs seek, inter alia, equitable remedies with respect to the class as a whole.

55. Defendants' systemic policy and practices make declaratory relief with respect to the Class as a whole appropriate.

**G.     The Prerequisites of Rule 23(b)(3) are Satisfied**

56. This case satisfies the prerequisites of Fed. R. Civ. P. 23(b)(3). The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual members of the Class will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, especially when compared to the relatively modest amount of monetary, injunctive and equitable relief at issue for each individual Class member. This action will be prosecuted in a fashion to ensure the Court's able management of this case as a class action on behalf of the class defined above.

**FRAUDULENT CONCEALMENT**

57. Throughout the Class period, Defendants affirmatively concealed from Plaintiffs and Class the defect described herein.

58. Defendants had a duty to inform Plaintiffs and Class of the defect described herein, which it knew of or should have known. Notwithstanding their duty, Defendants never disclosed the defects to Plaintiffs or the Class; rather, Defendants attributed resulting damage to faulty installation, maintenance or other third-party conduct.

59. Despite exercising reasonable diligence, Plaintiffs and Class could not have discovered the defects or Defendants' scheme to avoid disclosure of the defect. Thus, running of

the statute of limitations has been tolled with respect to any claims that Plaintiffs or the Class have brought or could have brought as a result of the unlawful and fraudulent course of conduct described herein.

60.     Defendants are further estopped from asserting any statute of limitations defense, contractual or otherwise, to the claims alleged herein by virtue of its acts of fraudulent concealment.

## CAUSES OF ACTION

### COUNT I

**Violations of Section 17(a)(1) of the Securities Act
[15 U.S.C. § 77q(a)(1)] against David Hernandez and Nextstep Financial Services, Inc.**

1-60.   Paragraphs 1 through 60 of the complaint are incorporated herein by reference as if fully restated.

61.     As is set forth more fully herein, Hernandez and Nexstep Financial Services, Inc., in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly employed devices, schemes or artifices to defraud.

62.     Hernandez and Nexstep Financial Services, Inc. knowingly or recklessly engaged in the fraudulent conduct described above.

63.     By reason of the foregoing, Hernandez and Nexstep Financial Services, Inc. violated Section 17(a)(l) of the Securities Act [15 U.S.C. § 77q(a)(l)].

## <u>COUNT II</u>

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
And Rule l0b-5 Thereunder [17 C.F.R. § 240.l0b-5] David Hernandez and Nextstep
Financial Services, Inc.**

1-60.   Paragraphs 1 through 60 of the complaint are incorporated herein by reference as if fully restated.

61.    Hernandez and Nexstep Financial Services, Inc., in connection with the purchase or sale of securities, directly or indirectly, by the use of the means or instrumentalities of interstate commerce or of the mails: (a) used or employed a device, scheme, or artifice to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) and engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon the purchasers and prospective sellers of such securities.

62.    Hernandez and Nexstep Financial Services, Inc. acted knowingly or recklessly when they engaged in the fraudulent conduct described above.

63.    By reason of the foregoing, Hernandez and Nexstep Financial Services, Inc. violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule l0b-5 promulgated thereunder [17 C.F.R. § 240.l0b-5].

## COUNT III

**Aiding and Abbetting Violations of Exchange Act Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] And Rule l0b-5 Thereunder [17 C.F.R. § 240.l0b-5] against Defendants Nextstep Medical Staffing IL, Inc., Nexstep Holdings, Inc., Spectrum Entertainment Group, Inc., The Ilumina Group, Inc., Gina M. Hernandez, Michael North, Daniel Jiggetts, and Cortez Trotter**

1-60.    Paragraphs 1 through 60 of the complaint are incorporated herein by reference as if fully restated.

61.    Nextstep Medical Staffing IL, Inc., Nexstep Holdings, Inc., Spectrum Entertainment Group, Inc., The Ilumina Group, Inc., Gina M. Hernandez, Michael North, Daniel Jiggetts, and Cortez Trotter knowingly or with severe recklessness provided substantial assistance in connection with the purchase or sale of securities, directly or indirectly, by the use of the means or instrumentalities of interstate commerce or of the mails: (a) used or employed a device, scheme, or artifice to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) and engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon the purchasers and prospective sellers of such securities.

62.    Nextstep Medical Staffing IL, Inc., Nexstep Holdings, Inc., Spectrum Entertainment Group, Inc., The Ilumina Group, Inc., Gina M. Hernandez, Michael North, Daniel Jiggetts, and Cortez Trotter acted knowingly or recklessly when they provided substantial assistance in connection with the fraudulent conduct described above.

63.    By reason of the foregoing, Nextstep Medical Staffing IL, Inc., Nexstep Holdings, Inc., Spectrum Entertainment Group, Inc., The Ilumina Group, Inc., Gina M. Hernandez,

Michael North, Daniel Jiggetts, and Cortez Trotter violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule l0b-5 promulgated thereunder [17 C.F.R. § 240.l0b-5].

## COUNT IV

### Violations of Section 12 of the Securities Act
### [15 U.S.C. § 771] against all Defendants

1-60.    Paragraphs 1 through 60 of the complaint are incorporated herein by reference as if fully restated.

61.    Defendants, directly or indirectly, singly or in concert with other, in the offer and sale of securities by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

62.    As part and in furtherance of this scheme, defendants, directly and indirectly prepared, disseminated or used and or used contracts, written offering documents, promotional materials, investor and other correspondence, and oral presentations, including by not limited to monthly account statements, which contained untrue statements made, in light of the circumstances under which they were made, not misleading, or aided and abetted therein. Defendants made the referenced misrepresentations and omissions knowingly or grossly recklessly disregarding the truth.

## COUNT V
**Breach of Contract against David Hernandez and Nextstep Financial Services, Inc.**

1-60.    Paragraphs 1 through 60 of the complaint are incorporated herein by reference as if fully restated.

61.    Each Plaintiff and Class Member had a contract with one more of the defendants pursuant to which funds were transferred to such defendants for the express purpose of investing in securities and/or purchasing CDs and/or to be held by the defendants in deposit accounts.

62.    For those Class Members, including Plaintiffs, who transferred funds and or directed or authorized the purchase of securities, the defendants agreed to promptly make such purchases from the funds provided, and to hold or ensure the holding of such securities in an account denominated in the name of such Plaintiffs and Class Members.

63.    For those Class Members, including Plaintiffs, who purchased CDs, the defendants agreed to return to each Plaintiffs and Class Member the principal delivered to the defendants upon demand or the maturation of such CDs.

64.    For Class Members, including Plaintiffs who transferred funds which defendants were to hold in deposit accounts, the defendants agreed to return to Plaintiffs and Class Members on demand all such funds.

65.    Upon information and belief, defendants breached the contracts identified above by:

        a.    failing to promptly purchase the securities authorized or directed to be purchased from the funds provided by each such person and failing to hold such securities in an account denominated in the name of each such person;

        b.    failing to promptly purchase the CDs as agreed and failing to deliver the principal reflected on such CDs upon demand or maturation of such CDs; and

- 21 -

       c.      failing to properly care for and ensure the security of the funds transferred to the defendants to be held in a deposit account.

66.    As a result of the actionable conduct set forth above, the Plaintiffs and Class Members have been damaged in an amount in excess of the jurisdictional limits of this Court for which Plaintiff and the other Class Members see judgment.

<u>**COUNT VI**</u>
**Unjust enrichment against All Defendants**

1-60.   Paragraphs 1 through 60 of the complaint are incorporated herein by reference as if fully restated.

61.    Hernandez, NextStep Medical, NextStep Holdings, Spectrum, Ilumina, Gina Hernandez, Michael North, Be Be North, Daniel Jiggetts, and Cortez Trotter have no legitimate claim to such funds that they received or from which they otherwise benefited, directly or indirectly.

62.    Based upon the allegations set forth above, Hernandez, NextStep Medical, NextStep Holdings, Spectrum, Ilumina, Gina Hernandez, Michael North, Be Be North, Daniel Jiggetts, and Cortez Trotter have been unjustly enriched by their direct or indirect receipt of or benefit from investor funds.

63.    Plaintiffs are entitled to an order, pursuant to common law equitable principles and also pursuant to Section 21 (d)(6) of the Exchange Act [15 U.S.C. §u(d)(5)], requiring NextStep Medical, NextStep Holdings, Spectrum, Ilumina, Gina Hernandez, Michael North, Be Be North, Daniel Jiggetts, and Cortez Trotter to disgorge all of the proceeds of investor funds they received or from which they benefited, either directly or indirectly.

## COUNT VI
### Common Law Fraud against All Defendants

1-60.   Paragraphs 1 through 60 of the complaint are incorporated herein by reference as if fully restated.

61.   Defendants Hernandez, NextStep Medical, NextStep Holdings, Spectrum, Ilumina, Gina Hernandez, Michael North, Daniel Jiggetts, and Cortez Trotter made fraudulent misrepresentations to Plaintiffs and Class Members regarding the sale of certain securities.

62.   Defendants made said misrepresentations knowingly or with reckless disregard for the truth of said statement.

63.   Defendants made the statements with the intent for Plaintiffs and Class Members to act; namely to purchase securities from Hernandez and NextStep.

64.   Plaintiffs and Class Members relied on Defendants' misrepresentations to their detriment.

65.   Plaintiffs and Class Members have been damaged by Defendants misrepresentations in an amount in excess of the jurisdictional limits of this court for which Plaintiffs and the other class members seek judgment.

## COUNT VI
### Negligence against All Defendants

1-60.   Paragraphs 1 through 60 of the complaint are incorporated herein by reference as if fully restated.

61.   The conduct set out above constituted actionable negligence by each defendant. As a result of the actionable conduct set forth above, the Plaintiffs and Class Members have been damaged in an amount in excess of the jurisdictional limits of this court for which Plaintiffs and the other class members seek judgment.

- 23 -

## COUNT VI

**Illinois Consumer Fraud and Deceptive Practices Act—815 ILCS 505/2 *et seq*.**

1-60.    Plaintiffs reallege and incorporate by reference paragraphs 1-60 above as if set forth fully herein.

61.    At all relevant times there was in full force and effect the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, *et seq*. (the "Consumer Fraud Act").

62.    Plaintiff brings this claim as constituting an "deceptive" practice under the Consumer Fraud Act.

63.    Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, provides, in pertinent part:

> *Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act, approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.  In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission.  (footnotes omitted)*

64.    Plaintiff and members of the class are consumers and Defendants are engaged in trade or commerce.

65.    Defendants' conduct as alleged herein constitutes an unfair practice because it is unlawful, offends public policy as established by statutes, and it is immoral, unethical, oppressive and unscrupulous, and it results in substantial injury to consumers.

66.    Defendants' conduct as set forth herein implicates consumer protection concerns as it causes inaccurate credit information for consumers to be reported to consumer reporting agencies in violation of federal law.

- 24 -

67.     Section 10a of the Consumer Fraud Act, 815 ILCS 505/10a provides, in pertinent part:

>   (a)     *Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper...*
>
>   *       *       *
>
>   (c)     *Except as provided in subsections (f), (g), and (h) of this Section, in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.*

68.     Plaintiff and the members of the class have been damaged as a proximate result of Defendants' unfair practices in violations in that Defendants did not have Plaintiff's written consent to access Plaintiff's consumer report and Defendants lacked a permissible purpose for accessing Plaintiff's consumer report without Plaintiff's consent.

69.     The accessing of Plaintiff's consumer report without consent for the purposes of determining if Plaintiff qualifies to act as a cosigner does not constitute a permissible purpose for Defendant Chevrolet to access Plaintiff's consumer report.

70.     Defendants have obtained or used, or caused to be obtained or used, the consumer report of Plaintiff, and a large number of other consumers in the same manner.

71.     Defendants failed to comply with the requirements of the FCRA.

72.     Defendants' noncompliance with the FCRA was willful and done with a reckless indifference to the rights of others.

73.     Plaintiff brings this claim under F.R.C.P. Rule 23, on behalf of a class of all other persons similarly situated ("the class").

74.     The class consists of all persons with Illinois addresses to whom Defendants have accessed their consumer report without written permission or a permissible purpose, within two years preceding the filing of this action.

75.     The class is so numerous that joinder of all members is impracticable.

76.     Plaintiff believes that the class numbers in the hundreds or thousands.

77.     There are questions of fact and law common to the class, and these questions predominate over any questions affecting only individual members of the class.

78.     The predominant common question is whether obtaining a consumer report for the purpose of qualifying them as a cosigner without their written permission or for a permissible purpose violates the Illinois Consumer Fraud and Deceptive Practices Act.

79.     Plaintiff's claims are typical of the claims of the class members and are based on the same facts and law.

80.     Plaintiff and Plaintiff's counsel will fairly and adequately protect and represent the interests of the class.

81.     A class action is superior to any alternative for the fair and efficient prosecution of this litigation.

82.     Plaintiff, like all members of the class, has been damaged by the Defendants'

## RELIEF REQUESTED

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the other Class Members request that this Court enter a judgment:

A.      Determining that this action is properly maintainable as a as a Class action pursuant to rule 23 of the Federal Rules of Civil Procedure;

B.      Certifying the Plaintiffs as the Class Representative;

C.      For the securities law claims, damages measured by the out of pocket loss suffered by Plaintiffs and each Class Member or the benefit of the bargain that would have been realized by Plaintiffs and each Class Member had defendants representations been truthful, or recession or consequential damages;

D.      For the breach of contract and unjust enrichment claims, the benefit of the bargain, measured by the amount necessary to restore the Plaintiffs and each Class Member to the economic position they would have been in had defendants performed as promised;

E.      For the negligence and fraud claims, actual damages measured by the economic loss suffered by Plaintiffs and each class member;

F.      Attorneys' fees;

G.      Cost of suit;

H.      Pre- and post-judgment interest; and

I.      Any and all other relief this court deems just.

Respectfully Submitted,
Fred and Linda Samp

/s/ Mark D. Belongia
One of Plaintiffs' Attorneys

Mark D. Belongia, Atty #6269391
mbelongia@belongialaw.com
Kelly A. Saindon, Atty #6244793
ksaindon@belongilaw.com
Ian M. Burns, Atty #6282599
iburns@belongialaw.com
Belongia, Shapiro & Hynes, LLP
20 S. Clark St., Ste. 300
Chicago, Illinois 60603
P: 312.662.1030
F: 312.662.1040